And we welcome to the podium Mr. Beckman. Good morning, Your Honors. May it please the Court, Counsel. Let me start by saying we just learned last week that we were getting 15 minutes rather than 10, so I divided it 10 and 5. I'm going to try to stick to that, because there is one issue, the constructive discharge issue here, where the Court actually rules for us. And it's kind of a principal argument of their response to affirm on other grounds, so I expect to address that. Your Honors, 46 years ago, my client at the age of 19 went to work for Caterpillar, an aspiring engineer, not an engineer yet. He worked there for roughly 20 years until 24 years ago, last month, he was subjected to what a jury found to be a wanton and willful retaliation for, at the age of 41, making a complaint about that younger employees were being treated more favorably. And there was a basis for that, that is there was a restructuring in the company and only people 40 or over in that age range were treated less favorably. Judge Gorman, Magistrate Judge Gorman, sitting by consent, granted summary judgment on the age claim, but on the retaliation claim, he sent it to a jury and the jury found that Caterpillar had wanton and willfully violated the ADA by retaliating against my client for complaining about age. It was a rather terrible time for my client, took him four and a half years, with me representing him the last year and a half, to prevail at trial, and then he chose, rather than a payout, he chose to fight for reinstatement and prevailed. So in 2005, after being away from Caterpillar for four and a half years, roughly, he rejoined Caterpillar, which was his dream job, it's where an engineer wants to be in Central Illinois. Fast forward to the, I don't want to talk through the death notes, but 2013. And so what facts from the record connect the lawsuit in particular to the decision, I guess, that Raphenthal made, am I pronouncing that? Rampenthal. Rampenthal retaliated against him for that lawsuit 17 years ago. Okay, well, and again, this is where you get into the time period that in 2013, Mr. Rampenthal became Brian's supervisor. The prior supervisor, Mr. Sibley, had known about the lawsuit, we're not sure how, but he spoke favorably to Brian about how much he loved Caterpillar that he fought to come back. That changed with Mr. Rampenthal in that Mr. Rampenthal found out from Mr. Sibley, Mr. Sibley mentioned it to him when they switched supervisors, but didn't say anything to Brian about it. Within months of this, of him learning of the prior lawsuit, there were, according to, again, these death notes, which we would say are hearsay and absolutely inadmissible, except to the extent we use them as admissions. He began a campaign of sorts to blame Brian for things that didn't happen, and to make big issues out of things that weren't, and at least by our reading of the death note, to put him on an action plan for no apparent reason. We're skipping almost five years, and so that's why I'm asking you to kind of drill down in the limited time that we have this morning of the facts that support it. Okay, so we know from the record in 2013 that Rampenthal discovers that there was a lawsuit 17 years ago, and then from 2013 to 2018, that's where I'm asking for you to support this with some facts. Right, and let me say retaliation is not our only claim here. I think the age... The one I want to focus on right now, though, is retaliation, and then we'll move back. Sure, absolutely. So, of course, it is a stretch. It's a long period of time, but when you play out the sequence that the HR manager, Mr. Konsky, did not agree with putting Brian on an action plan then, and then Mr. Konsky remained the HR manager, and remember that Mr. Rampenthal placed in his notes that he was going to HR because Brian had filed a lawsuit and won. Now, there are probably two interpretations you could give to that, but that's for a jury to decide, we would say. Brian then, within a year and a half, became involved in this very important noise reduction, because Brian was both a job owner lead... Sound engineer. And a very skilled sound engineer, and he made a breakthrough discovery, but it took a year and a half. That ended in the middle of 2017. That's when Brian went from working 45 to 55 hours a week to what Mr. Rampenthal said was 38 hours a week, roughly, and made a big deal about. But within two months of that project ending and this major success happening, Mr. Rampenthal goes to Ms. Huber, Heather Huber, a brand new person in the HR department, and says, I'm having a problem with Brian Murphy. What's interesting, though, is nowhere in the record is there any problem that they identified prior to him going. All of the problems that are identified in the action plan are all things that happened after he went to Ms. Huber. So the question is, what was it that caused him suddenly, within two months of Brian finishing this project, where there was no way they were going to let him go, that caused Mr. Rampenthal to now go to Ms. Huber and say, I'm having this young, junior, new HR person, I'm having a problem with Mr. Murphy. Wasn't there a performance review that articulated problems that Mr. Rampenthal had with Brian's performance in advance of going to HR? Absolutely not. The 2017 review, which they say was, which Caterpillar says was finished in November, the review for 2017, which he says he finished in November 2017, was all positive. It was all meeting or exceeding expectations. There were a couple of references to things. I didn't see any exceeding. I did see meeting. I know that Brian assessed himself as exceeding. I believe there were exceeding from Mr. Rampenthal, too, but at a minimum. But there's nothing in there that is a criticism. There's comments about what Brian could do better, but that's every year, and that's every person. I mean, that's the goal. But there's absolutely no hint that Brian is failing. No, I didn't say failing. You represented that there were no concerns until after he spoke with HR. And so I asked about the performance evaluation in 2017 that identified issues with Mr. Murphy's performance. And so was it your representation that those are not in the performance evaluation? I just want to make sure that we're splicing this correctly. Yes, and no, our position would be that there's nothing in there that qualifies as a problem with the way he's performing his job. There are things he can do better. There are issues. But most of you read that report, Your Honor, and it's about a guy who's a great engineer and needs some work on the leadership part, because he has this two-part job because he's an expert, but he's also a job owner lead. And it's the job owner lead, and there are some concerns. There are some e-mails going back and forth with other job leads regarding Mr. Murphy and Mr. Bruce and whether or not. Actually, Your Honor, Judge Shadid paid enough. It's interesting. There's only one, and that's the February 29th e-mail from Jeff Bruce to Mr. Rampethal, which is so outrageous that Caterpillar doesn't even rely on it, even though it's the only negative comment by anyone in the record other than Mr. Rampethal about Mr. Murphy's performance. And what's outrageous about it is that Mr. Rampethal went to Mr. Bruce, went to Jeff Bruce, who was Brian's friend, confidant, and equal. I mean, they were equals. They were in the same position, and asked him to put together all of the things negative he could think of about Brian Murphy. Why? I mean, why would you do that? And not only why would you do that, but that was the end. At that point, there was no way Brian and Jeff Bruce could continue working together. I mean, you now have two co-equals. Going back to the retaliation question, we have Bruce, we have the 2017 performance evaluation, and we have a lawsuit 17 years previous. What's the connection? Well, I mean, the connection is that as soon as Mr. Rampethal found out about the lawsuit, he starts documenting. There's no desk notes and whatnot from before he learns about it. It all starts afterwards, and all of the desk notes are these one-sided and, in some cases, dishonest, in many cases, dishonest, overstated statements. I agree. The retaliation theory is a stretch, but in the sense that it's who would wait five years to retaliate. But when you actually lay the line out of how things went with Brian's career, how the retaliation started almost right away, then took a break because Mr. Konsky said, no, no, no, we're not putting him on an action plan for these minor incidents. And then once Mr. Konsky leaves, now with Ms. Huber, a more junior who has no knowledge of the prior thing, he goes to her and says, I thought it was Rampethal who decided not to put him on the improvement plan in 2013 and instead to send him to harassment training. Well, that's what Caterpillar says. But the problem is, and this is a big part. I would ask your honors to really look at our arguments about hearsay. This is everything in the record. Everything in the record is Mr. Rampethal. Mr. Rampethal's desk notes. Clear hearsay. We filed a motion to reconsider. As much as I respect and I know Judge Shadid, he's central district. I'm central district. I did not understand his ruling. What do we have for age? I'm setting the desk notes aside. I'm saying even if I accept it, if I accept that the desk notes are hearsay, should not have been relied on. I still have to connect up that Rampethal's decision to place him on an action plan was connected to age. What do you have? Am I now down to three minutes? You're down to three minutes.  I'm sorry, what's that? I'm into my rebuttal time? Very quickly, under the McDonnell Douglas, we don't have to. All we have to show is that he met the Prima Fasci case and that Mr. Rampethal lied. That there are questions about the validity of his criticisms. Then it's up to a jury to decide whether Brian's age at 58 was the factor. I think that's a very important point. The judge just got it wrong in saying we needed evidence beyond pretext. If I can reserve the rest for my— I'm asking, though you're still not answering my question. I'm sorry. I realize the time is limited, so I need you to answer the question. What facts do you have that ties it to age? Your Honor, we don't, and that's what the judge was looking for. We don't have evidence that ties it to age other than his age. That is, he's 58 years old, and there's no reason to be getting rid of him. He's been there 39 years, and they put him on an action plan that even Judge Shadid said was obviously a constructive decision. They were getting rid of him. Why? So, Mike, I guess what I'm—I want to make sure that we're not representing that after 40, for no you can, an employer is unable to place someone— Oh, no, absolutely. —of the age of 40 on an action plan. Oh, no, absolutely not. Absolutely not. Of course they can. But the issue here was that the action plan, the only evidence at all of what Brian did, allegedly, didn't perform well, comes from Mr. Rampenthal's self-serving hearsay notes. So that's the—so that's the McDonald-Douglas test. He's 58. He's met all of the standards. It's a jury question on each of the standards. So he's entitled to allow a jury to decide whether the age was the basis for his termination. Mr. Backman, I don't want to interfere further with your rebuttal time. I'll ask the defense, and then I'll ask you in rebuttal, in essence, about just how important those death notes were in the summary judgment decision. Thank you. Thank you. All right. Ms. Smentek, and please correct my pronunciation when you approach. You got it right. Okay. Good morning, Your Honor. May it please the Court, my name is Cheryl Lee Smentek, and I am here on behalf of Appellant Caterpillar. We are here today because Appellant claims that Caterpillar terminated him because of his age and in retaliation for a lawsuit that was resolved 13 years prior involving a different supervisor than the supervisor involved here. There was no evidence in the record, admittedly, of age discrimination or retaliation. Instead, he relies almost exclusively on pretext. As this Court instructed in Ortiz v. Warner Enterprises, Inc., the District Court was required to consider the evidence as a whole to decide whether a reasonable— Could he consider the death notes? I do believe that he could consider the death notes for a couple of different reasons. Number one, the 2018 death notes were all admitted by the appellant. They were deemed material and undisputed. What do you mean admitted? So, in summary judgment, the Central District requires him to go through all of the statement of facts that we put forth and provide evidence to dispute them. And instead of disputing them, he admitted them. But he objected to them as hearsay, correct? No, he did not. The only hearsay objection he made in the underlying case was with respect to the 2013 death notes, which are not a basis for Mr. Rampenthal's belief that he wasn't performing in 2018. So, I think his admissions would render those exhibits admissible, but more importantly, even if you throw the death notes aside, we still have the PowerPoint presentation that Mr. Rampenthal provided to the appellant, discussed it with him, and listed specific examples of all of the performance deficiencies that he had. And again, the appellant doesn't contest anything. Ms. Sementek, I understand, I think, that side of your case. I also, I can't remember a case in which an employer was so harshly critical of an employee's performance leading to the actions taken here, where the plaintiff also has evidence like the commendations for the 2017 noise reduction project, and the very positive performance review completed by the same supervisor for 2017. So, Mr. Rampenthal's performance review in 2017 and in years prior criticized appellant's conduct with respect to implementation. As a job owner lead, he was responsible for leading his team and implementing his project. There are criticisms, yes, but he exceeded or met, in his supervisor's view, all of those expectations in the 2017 review, correct? He met expectations as a whole for his job, but with respect to those specific... And for each of the categories. With respect to implementation, it was noted that he was not doing his job. He didn't give him a does not meets for that. He was meeting it, but he basically said you need to spend more time doing these things, and in the months that followed his assessment of that particular job task, appellant wasn't meeting those expectations. And where do we see this in the 2017 review? My apologies. I believe it's in the first bullet that he talks about implementation and not meeting implementation. In addition, it was something that was pointed out by both the trial court in its summary judgment decision as well as the briefing on summary judgment below. Brian, I see that. Okay, on the first page, Brian has the opportunity to play a stronger team lead role in implementation. Completion of our cartridge filter program. Okay. Overall rating, expected level of performance. And I've just rarely seen this kind of dramatic collapse of perceived performance. What happened? So in the months that followed his assessment in November of 2017 that Brian was meeting expectations, there was an appreciable drop off on how he was performing with respect to implementation. Problems were coming to light, coming to Mr. Rampenthal from other people, not from appellant himself, saying, hey, we've got a problem with this particular project, there's no plan in place to implement this, or it's going to be late, or we don't have the right product to put into motion. And all of these things are coming at Mr. Rampenthal, and he's trying to figure out what's going on, and he's asking appellant, what about this, what about this, and what about this? And appellant's not really being responsive or taking ownership of that particular portion of his job, which was a problem for Mr. Rampenthal. And after he'd asked him numerous times on different projects, are we going to fix this, how are we going to fix this, he didn't feel that he had sufficiently addressed any of those issues, and he felt like he needed to take steps to put him in a position to do that, which is why he ultimately decided to put him on an action plan. And I think going back to that PowerPoint presentation, again, throwing the desk notes aside for just a second, and what led up to it, but again, the PowerPoint presentation gave specific examples of the places where Rampenthal thought that appellant was not meeting his job expectations. And he said to him, these are the things I need you to work on. And appellant in the meeting didn't contest those, in summary judgment briefing didn't contest those, in his own deposition didn't contest those. He said he felt that it was retaliation, and he felt that it was a discrimination, and he felt that he was going to be terminated because he could never complete this plan, but what he did do is say, that's not true. I am not responsible for that, or I did do that, or somebody is not telling you the truth. He never said those things to Mr. Rampenthal. And so Mr. Rampenthal was basing his beliefs on these months leading up to the action plan, that these projects weren't getting done, and that appellant was responsible for it. And there's no evidence in the record that Mr. Rampenthal did not honestly hold the belief that appellant wasn't performing his job in these respects at all. There's no evidence that suddenly, for some unknown reason, that he would just decide, I want to get rid of this guy. I want him gone. He really wanted him to do his job, which is the whole point of an action plan. So I understand that as a jury argument. In looking at the action plan, I think we all understand that constructive discharge is a pretty high standard. But I look at this, and I see it includes a date that's already passed, and I see signatures from Huber, Moore, and Rampenthal did not meet action plan. Hard to understand why that's not a jury issue at least on the constructive discharge. So Ms. Huber testified in her deposition when she was specifically asked, why is this box labeled does not meet action plan? And Ms. Huber said that is the name of the action plan, and that it's Caterpillar's practice to require anybody that's put on an action plan to sign the action plan in this spot for does not meet title of the plan for signatures, and that once the employee completes the action plan successfully, it discards those signatures. So, for instance, we have Mr. Rampenthal. That's crazy. Why would anybody even believe that? There's no evidence in the record that that isn't how they do it. I'm looking at ‑‑ I'm just taking the document at face value. And, again, Ms. Huber suggested that that was what happened. With respect to the date, but I do want to address your question with respect to the date that had already passed, they had drafted the plan a few days before it went to Mr. Murphy to take a look at it, and he came back with some changes, and he noted in his suggested changes, hey, this date is passed. And in response, they said, look, any date concerns you can address with Mr. Rampenthal, suggesting that they could be changed. There was no reason why ‑‑ Suggesting they could be changed but are asking him to sign a document that, in essence, says I've already missed a do or die deadline, right? Well, I mean, I wouldn't qualify it as do or die, but yes. Well, this is ‑‑ he's going to be discharged if he doesn't fulfill this plan, right? That is a ‑‑ And there is a specific date that has already passed before the document even takes effect. And we've got the signatures that say does not meet. What's wrong with Judge Shadid's analysis on that? I don't believe that that shows that it's absolutely certain that he wouldn't have passed that plan and that it's absolutely certain that Caterpillar would have terminated it. Absolute certainty is not the standard, and he is being asked to ‑‑ he's being given a document. It's like being given a loan document to sign that shows you're already in default, right? And the bank says trust us, we'll be reasonable. But even if you find constructive discharge, you still have to show that there's either intent, discriminatory or retaliatory intent, or pretext. And we don't have anything like that. Those are separate issues. I agree. So I don't concede that there was constructive discharge here, but to the extent that you find it, I don't think it matters to the outcome of the case. I do not think that there is any evidence that appellant's age or his 17‑year‑old lawsuit were the reasons for Mr. Rampenthal putting him on this action plan as opposed to his deficient performance. And, again, there's ample evidence in the record that Mr. Rampenthal honestly believed that he wasn't performing well. And, again, appellant did nothing to contest that evidence on summary judgment and did nothing to contest that evidence here. But he did ‑‑ the plaintiff did put into evidence, though, praise for his coming in from other people for his work, including in March of 2018, correct? He did. However, that praise was not from Rampenthal. It was from a different person on a different project that wouldn't necessarily show that Mr. Rampenthal's belief with respect to his performance on other projects with other supervisors and other coworkers wasn't deficient. This Court has held on occasions that coworkers and other supervisors who are not involved in the decision with respect to the adverse employment action aren't relevant to the question. The only person that's relevant here is Mr. Rampenthal's honest belief. Could I ask you about footnote three in your brief?  Where you say, Murphy's muddling the record by asserting facts that have no citation. Quote, Caterpillar cannot wade into the weeds to indicate each of these instances and trust that the Court can identify facts that are actually supported by the record evidence. Seems to me like you're asking us to do your job there. And I would welcome your top three examples. I'll give you my top two that I have off the top of my head and I'll think about the third one. I'm giving you those two. So, for instance, one of the things that appellant's counsel just argued was that Ms. Huber was an inexperienced HR representative and that Mr. Rampenthal laid in wait for her to come into the job so that he could then take adverse action against appellant for his age and or his lawsuit. There is zero evidence in the record that Ms. Huber was inexperienced at all. She was new to this role, but she had been at Caterpillar for several years and had worked at other jobs prior to Caterpillar for several years in an HR function. So there's no evidence in the record that she was inexperienced. There's also no evidence in the record that he laid in wait for an inexperienced HR representative to come in. There's no evidence in the record that Mr. Konsky, the prior HR representative, left before this October timeframe. Nobody testified about Mr. Konsky's tenure at Caterpillar. We know he was in place in June of 2013 and that we know Ms. Huber was in place in October of 2017, but who was in between them, we have no idea because nobody bothered to put any evidence in the record about that because it didn't matter. The other place that he has taken liberties with the record is his contention that Mr. Rampenthal asked Jeff Bruce to prepare secret reports about a palant's performance deficiencies. In fact, Mr. Rampenthal denied that this occurred, and the only thing that a palant has basis on, because he has no personal knowledge of what Mr. Rampenthal told Mr. Bruce, is this email which says, quote, per our Friday discussion. He then extrapolates without any evidence whatsoever that Mr. Rampenthal then coerced or suggested or required Mr. Bruce to write these really nasty performance evaluations about a palant. And there's no evidence in the record that that happened. In addition, he talks about, I'm just trying to find it. Oh, Mr. Konsky, the HR representative, and I believe you raised this on his opening argument. It wasn't the HR representative in 2013 who suggested a performance improvement plan. The evidence in the record all suggests that Mr. Rampenthal did, and in fact, a palant's counsel asked Mr. Rampenthal at his deposition who suggested the action plan at that time, and Mr. Rampenthal testified that it was him. In 2013? In 2013. And so Mr. Rampenthal made the decision not to put him on an action plan in 2013. Where? Not the HR representative. That's where he's taking liberties with the record, because he argued before you that it was the HR representative who suggested an action plan, or that it was Rampenthal that suggested an action plan, and the HR representative said, no, no, no, we're not going to do that. There's no evidence in the record of that. I have a question. Okay. I'm still totally confused by what you just said. Let me try to clarify, because I apologize. I was thinking on my feet a little bit. You had asked me to give you the top three examples where they've taken liberties with the record. He argued, on summary judgment and before you, that in 2013, the HR representative told Mr. Rampenthal, no, you're not going to put the appellant on an action plan. Whereas the record evidence establishes that it was the HR representative who suggested the action plan, and Mr. Rampenthal said no. So the exact opposite of the argument. I do see that I am out of time. If you have no further questions, I thank you, and I ask you to affirm. All right. Well, thank you. We welcome back Mr. Backman. Good to see you. Thank you. We'll give you your ‑‑ let's see where you were. You had reserved five, and then we questioned you, so we'll give you two. Okay. I will be quick. This was not a trial. This was summary judgment. Everything that my esteemed colleague referenced as being facts in the record are hearsay notes or testimony from Mr. Rampenthal. You look at the notes. We interpret them one way. Caterpillar interprets them another way. That's for a jury. These are Mr. Rampenthal's notes. That's the point of why we filed the motion to reconsider on that point. Because this whole case is about Mr. Rampenthal, nobody else. According to Caterpillar and Judge Shadid, it didn't matter what anybody else said. All that mattered was what Mr. Rampenthal said. So if Mr. Rampenthal decided to get rid of Brian, there was no way to prevent it. He kept desk notes that were hearsay. He testified, but that's for a jury. This is summary judgment. The fact that Judge Shadid believed it, the fact that your honors may believe it, is not the point. It's for a jury to decide. There is certainly evidence in the record. Let me say one other thing. We did not submit the 2018 notes. We put them in the 2018 desk notes because there were admissions that we wanted to use. And you can use a document, desk notes, maybe it's hearsay for Caterpillar to use. It's admissions for us to use. So it is not true to say we put them in the record and admitted to their belief. Did you object? Yes, in the court. But look, we objected to the use of all of those records. So you objected to the use of all of the desk notes, not just in the 2013? Absolutely. Did you object to them as hearsay? As hearsay. All of the desk notes. All of the desk notes, self-serving hearsay. To be used by Caterpillar. Yes, to be used by Caterpillar. We could use them for the admissions and the proven lies. But absolutely, we did not say 2013 is okay. It's bad. 2018 is okay. Absolutely not. This whole case was based on desk notes that Mr. Rambenthal kept that don't even come close to qualifying for the business records. Rather, if you look at the Jones case that we cited, the district court case, speaks perfectly to how, in a case like this, a supervisor who wants to get rid of an employee can get his own desk notes, making his own comments, creating a record, and then terminating. And there's nothing you can do. Except there is something we can do, which is to let a jury decide. And that's where this should go. And the last point I want to make quickly on this issue of the age. Again, under Ortiz and the recent Vickio case that I cited in my reply brief by this court, they're very clear. If we satisfy the Prima Fasci case and we show questions, problems, with potential pretext by Mr. Rambenthal, then we get to argue to a jury. That is the law. So we would ask that you reverse, send it back to where it should go, which is to a jury trial. And I thank you, Your Honor, for your time. All right. Well, thank you to Mr. Beckman and Ms. Smentech. We will take the appeal under advisement. We'll now take a brief recess.